Filed 12/17/24  In re A.J. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

|  |  |
|---|---|
| In re A.J., a Person Coming Under the Juvenile Court Law. | C099657 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.J. et al.,<br><br>Defendants and Appellants. | (Super. Ct. No. STKJDDP20200000248) |

J.J. (father) and J.R. (mother) (collectively, parents) appeal from juvenile court orders under Welfare and Institutions Code section 366.26 terminating their parental rights to their daughter, A.J. (daughter).  Mother contends the court prejudicially erred by applying an improper factor in finding the beneficial parental relationship exception to adoption (the parental relationship exception) inapplicable.  And father contends the court prejudicially erred by appointing a guardian ad litem for him without due process.

1

Because parents fail to show prejudicial error, we affirm.  Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

FACTUAL AND PROCEDURAL BACKGROUND

In July 2020, the San Joaquin County Human Services Agency (the agency) filed a petition in juvenile court to assert dependency jurisdiction over daughter (age 8) after father and his girlfriend refused to pick up daughter from a hospital following a mental health hold.  Daughter had been diagnosed with schizophrenia, depression, anxiety, and attention deficit hyperactivity disorder, had attempted suicide three times, had daily violent tantrums, and had been physically violent toward her sister (also parents' child; sister).  Father and girlfriend indicated they were unable and unwilling to resume care for daughter.

The court ordered daughter detained in protective custody, later adjudged her a dependent of the court, and ordered reunification services.  Daughter was placed with caregivers in July 2020, where she remained throughout the case.

I

*Father's Relationship with Daughter During Reunification Services*

Father and daughter had one-hour remote visits twice per week, but father sometimes ended the visits within the first 15 to 30 minutes.  Father also had to be reminded that he could not have girlfriend involved in the visits because her involvement made daughter anxious and upset.

In October 2020, daughter alleged multiple incidents of emotional and physical abuse by girlfriend and made it clear she did not want to return to father's home if girlfriend would be there.  In March 2021, daughter no longer wanted visits with father because of girlfriend's continued involvement with him.  By April 2021, father opted to sever his relationship with girlfriend to mend his relationship with his children; when informed of that decision, daughter expressed an interest in phone visits.  By August 2021, one impromptu, in-person contact with father had occurred and went well, so

2

supervised visits were being set up. But between then and January 2022, although father completed his case plan objectives, daughter was reluctant to visit father outside of larger family gatherings.

## II

### *Mother's Relationship with Daughter During Reunification Services*

At the time the petition was filed, mother had lost custody of daughter and sister to father and mother's whereabouts were unknown. According to the agency, it appeared that mother did not have a steady presence in daughter's life in the last few years.

In August 2020, mother made her first appearance in this case and received authorization for supervised visits. At first, daughter did not want visits but started them remotely in October 2020. Before the visits began, daughter told the social worker she wanted to go back to mother but stay with her caregivers for now. The social worker described mother's "lack of parent-to-child bonding [or] involvement" as a problem requiring intervention.

In a separate proceeding in November 2020, sister was detained from father's custody and placed with a relative. Supervised in-person visits for daughter with mother and sister began in February 2021 and progressed to overnight visits. But the overnight visits soon brought up hostile sibling rivalry issues, and by September 2021, daughter no longer felt safe with sister. According to one of daughter's caregivers, daughter also felt that mother could not protect her from sister.

Although mother completed her case plan objectives, the attempt to resume joint sibling overnight visits at her home failed, presenting a problem after sister was placed in family maintenance with mother. Mother had difficulty managing the siblings together and understanding daughter's mental health needs. By January 2022, daughter did not want to visit mother outside of visits that included extended family or other caregivers.

3

III

*Family Counseling Unsuccessful*

Family counseling was put in place for daughter, father, mother, and sister to address daughter's reluctance to visit, but daughter either remained silent during the sessions or provided "I don't know or I don't remember" responses to questions. The sessions also resulted in stress that caused daughter's behavior to decline.

At a February 2022 hearing, the social worker indicated that daughter's behavioral health team did not think the counseling sessions were a good idea. The social worker recommended ending them because they were not in daughter's best interest. The court agreed not to force her to participate in them. Daughter ended up attending only a few sessions and later refused to participate in them altogether.

At the same February 2022 hearing, father and mother asked for discretion for the agency to increase visits, but daughter's counsel responded that daughter did not want an increase and wanted "things to maintain the way that they are right now." The court granted the agency discretion if daughter changed her mind.[1]

IV

*Termination of Reunification Services*

At the 18-month review hearing[2] held in April 2022, the agency recommended termination of reunification services and setting a section 366.26 hearing. According to

---

[1] Neither parent questioned the propriety of the court's visitation orders or their enforcement. (See *In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1046 [when child refuses visitation, it is the parent's burden to request a specific type of enforcement].

[2] Administration of dependency cases requires recurrent reviews of the status of the parents and the children. (*In re Candace P.* (1994) 24 Cal.App.4th 1128, 1132.) These reviews are referred to as "6-month," "12-month," and "18-month" reviews. (*Ibid*.) The 18-month review hearing represents a critical juncture in a dependency proceeding. (*In re J.E.* (2016) 3 Cal.App.5th 557, 563; see § 366.22, subd. (a).) The minor must either be

the social worker, daughter was doing well with her caregivers, had not had any psychiatric placements, was fearful of father's home, did not feel safe in mother's home because of issues with sister, and felt safest with her caregivers. The agency argued that returning daughter home would cause her to lose the progress she had made.

In a report for the hearing, the social worker provided additional insight on daughter's thinking. On one occasion in December 2021, daughter told the social worker she wanted to stay with her caregivers "until she [was] ready to go home" with mother, but daughter was also clear that she would not be "ready" for some time. When pressed for more specifics, daughter responded, "I don't know, I can't remember," a response the social worker attributed to daughter's mental health trauma. Daughter otherwise consistently stated she wanted to stay with her caregivers.

Father objected to a section 366.26 hearing and argued that insufficient reunification services were provided. Mother admitted that daughter and sister "just don't really get along" and that family counseling was ineffective. But mother maintained that the record showed daughter still wanted a relationship with mother and sister.

The court found it was not substantially probable that daughter would be returned to parents within 18 months of the original detention, ordered reunification services terminated, and set a section 366.26 hearing. The court allowed visitation with parents to continue if it did not disturb daughter's mental health.

---

returned to the physical custody of his or her parent or the court must terminate reunification services and set a hearing for the selection and implementation of a permanent plan (a section 366.26 hearing). (*In re J.E.,* at pp. 563-564.)

V

*Section 366.26 Hearing and Appointment of Guardian ad Litem*

The section 366.26 hearing was originally scheduled for August 2022 but was stayed for several months by father's writ petition to this court.[3]

In August 2022, the agency reported that daughter had not visited father since a family gathering in December 2021, had not visited mother since January 1, 2022[4] but was open to receiving letters. Daughter reported feeling anxious during and after visits with parents and displayed anxiety simply when parents were discussed. Meanwhile, she felt stable, safe, and secure with her caregivers and continued to work on her emotional wellbeing through individual therapy and rehabilitation services. Daughter also consistently stated her desire to be adopted. After concluding that loss of the parental relationship did not outweigh the stability of a permanent adoptive home, the agency recommended adoption.

In January 2023, the agency reported that daughter started accepting visitation with mother and father in November 2022 for daughter's birthday but was not ready for consistent visits. According to daughter's caregiver, daughter was scared, daughter didn't know mother, sister was always mean to daughter, and father didn't listen to daughter when she told him she was being hurt.

After the stay was lifted, the section 366.26 hearing was set for April 2023, but father's counsel requested a continuance and appointment of a guardian ad litem to provide "additional help to understand the legal processes." Not wanting to "leave an appealable issue," the agency asked the court to go and ahead and appoint the guardian ad

---

[3] Father's writ concerned the Indian Child Welfare Act (25 U.S.C. § 1912) and is not relevant to this appeal.

[4] It does appear that daughter spent time with parents, sister, and extended family at father's February 2022 wedding and in March 2022.

litem, after which the court requested an assessment for father. Two months later (June 2023), the agency informed the court that no date was set for the assessment due to a backlog and asked the court to proceed with the appointment. Father's counsel agreed, and the court proceeded with the appointment "for judicial economy."

The following month, the agency filed a supplemental report for the section 366.26 hearing. Daughter was now seeing mother once a month on average, but there was no set visitation schedule. As to father, daughter's lack of interest in visits with him was further cemented after she participated in a forensic interview in February 2023 that caused her to relive certain trauma. Meanwhile, daughter had shown much progress since the agency's last report. Her grades had improved, and she had met nearly all her therapeutic goals. She also made it clear that although she enjoyed family visits, she would like to complete the adoption process. The agency continued to recommend adoption.

The section 366.26 hearing occurred in September 2023. A social worker testified that mother had spoken to daughter a few days before the hearing, had not visited daughter for the two months before that, and saw daughter about once per month in the last year. Visits with mother depended on when mother reached out to request them.

Daughter, now almost 12 years old, testified that she considered the other kids in her caretakers' home siblings and wanted to be adopted by her caretakers. When father's counsel asked if she would prefer guardianship if that meant she could see her family when she wanted, daughter responded, "I don't know." And when father's counsel asked how she would feel if she never got to see or talk with mother, she responded, "Sad." But when counsel asked if she wanted an ability to have a relationship with mother, she answered, "Well, I don't really know."

Both parents asked the court to allow guardianship. They argued that daughter did not understand the difference between guardianship and adoption and was unsure of what she wanted. Mother added that daughter had spent most of her life in the care of her

7

family, maintained a good relationship with parents, and would be sad if her ability to communicate with her family was severed. And father, among various other arguments, claimed that daughter clearly wanted to maintain a relationship with her family while living with her caregivers and that severance from her family would cause trauma to her detriment.

## VI

### *Section 366.26 Ruling*

The court found the evidence clear and convincing that daughter was adoptable. Moving to the parental relationship exception, it found that parents did not demonstrate they had the requisite connection, noting that daughter "did not wish to visit" father because of emotional issues and visits with mother had "stopped for a significant period of time" and only recently resumed on a monthly basis. The court stated parents' duty to show "that the strength and quality of the relationship outweighs the security and sense of belonging" in the adoptive family. The court noted that daughter's current home gave daughter a stable environment and a sense of belonging and reasoned that daughter's report that she would be sad if she could not see her family was a "typical response" that did not outweigh the benefits and stability of the permanent home.

The court concluded by noting that while parents love daughter and want the best for her, they had "to show that they've been in a parental role, and that has not happened. They've not made the parental decisions in their child's life when they're rarely visiting. The parental roles shifted to the caregiver, and I think that's what transpired." The court found it was in daughter's best interest to have parental rights terminated.

Father and mother timely appealed.

8

I

*Parental Relationship Exception*

Mother contends the juvenile court prejudicially erred by relying on an improper factor in finding the parental relationship exception inapplicable. We disagree. Even assuming error, we find no prejudice.

If the court determines that the child is adoptable, it must "terminate parental rights and order the child placed for adoption" unless an exception applies. (§ 366.26, subd. (c)(1).) One such exception is the parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) In 2021, our Supreme Court clarified the elements needed to prove that exception in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). A parent must establish three elements by a preponderance of the evidence: "(1) the parent maintained 'regular visitation and contact with the child, taking into account the extent of visitation permitted'; (2) 'the child has a substantial, positive, emotional attachment to the parent'; and (3) 'terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home [the third element].' " (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 815, quoting *Caden C.*, at p. 636.)

Here, mother focuses on the juvenile court's final comment that parents were required to show they had been in a "parental role." According to mother, this comment indicates that the court relied on an improper factor under *Caden C.* that requires reconsideration by the juvenile court. We conclude that any error in this regard was harmless. (*In re J.R.* (2022) 82 Cal.App.5th 526, 531.)

Although *Caden C.* never explicitly questioned use of the phrase "parental role," some courts interpreting *Caden C.* have suggested that the phrase is ambiguous and can "create more problems than it solves." (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 211; *In re Katherine J.* (2022) 75 Cal.App.5th 303, 319.) Nevertheless, a parent must still show

that the child has "a substantial, positive, emotional attachment to the parent." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) This is where mother fails to show prejudice in the court's "parental role" comment.

Mother emphasizes the fact that daughter had been in mother's care for most of daughter's life (until age 8) and reminds us that daughter previously indicated a desire to return to mother's care. (*Caden C., supra*, 11 Cal.5th at p. 632 [relationship may be shaped by portion of child's life spent in the parent's custody]; *id.* [courts often consider how children feel about their parents].) But the record shows that mother had not been a steady presence in daughter's life during a few years preceding the petition. And the record overwhelmingly shows that daughter's attachment to mother over the course of the proceedings was detached and ambivalent at best. Such detachment and ambivalence do not evidence the required connection. (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230 [no emotional attachment when interactions between parent and child are ambivalent, detached, or indifferent].)

Early in the case, mother obtained permission for overnight visits but most of those visits did not occur because of daughter's refusal to attend and mother's inability to understand daughter's mental health needs and manage her conflicts with sister. In response, family counseling was instituted but was short-lived because daughter struggled with the sessions and ultimately disengaged. Then daughter stopped seeing mother (outside of father's wedding) for an extended period because daughter was not interested. After that, daughter resumed irregular monthly visits with mother but only when mother expressed interest. And at the section 366.26 hearing, daughter stated she wasn't sure she wanted to continue a relationship with mother. (*Caden C., supra*, 11 Cal.5th at p. 632 [courts may "consider how children feel about, interact with, look to, or talk about their parents"].) Given this record, it is not reasonably probable that the juvenile court would have found daughter had a substantial, positive, emotional relationship with mother had it not considered mother's parental role in daughter's life.

10

(*In re J.R., supra,* 82 Cal.App.5th at p. 533 [*Caden C.* error harmless in the absence of evidence of a substantial, positive, emotional attachment]; *In re Celine R.* (2003) 31 Cal.4th 45, 59-60 [judgment in dependency case should not be set aside for error unless it is reasonably probable the result would have been more favorable to appealing party but for the error].)

Mother's effort to argue otherwise is unpersuasive. The fact that daughter "enjoyed" visits with various family members after reunification services were terminated and that her recent visits with mother "went well for the most part" does not establish the requisite connection. In her reply brief, mother suggests that daughter unequivocally expressed her love for mother. But mother takes daughter's statement out of context. At the 18-month hearing, a social worker described conversations she had with daughter about returning home to parents. According to the social worker, daughter "in essence" communicated that while she loved parents, she was fearful of father's home, did not feel safe in mother's home, and felt safest in her caretakers' home. This testimony does not establish the requisite connection with mother; rather, it reinforces daughter's complicated and sometimes negative relationship with parents.

Anticipating this conclusion, mother contends the records forming the basis of the juvenile court's decision were inadequate because the social worker did not observe the visits between mother and daughter or try to objectively ascertain daughter's feelings toward mother. In support, mother relies on three cases that reversed juvenile court rulings entered *before Caden C.* was decided. (*In re Dy.P.* (2022) 76 Cal.App.5th 153, 161, 170; *In re J.D.* (2021) 70 Cal.App.5th 833, 849, 854; *In re D.M.* (2021) 71 Cal.App.5th 261, 267, 271.) But here, *Caden C.* had been decided months before the agency filed its 12-month report, so mother had the benefit of *Caden C.* and could have challenged the reports in the juvenile court. By failing to do so, she forfeited any argument about their adequacy. (See *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411-412.)

11

Also, mother fails to show error as to the third element of the parental relationship exception, namely, terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (See *In re Katherine J., supra*, 75 Cal.App.5th at p. 322, fn. 10 [a failure of proof on any of the elements is fatal].) For this element, the court must consider the harm to the child of severing the relationship and whether that harm outweighs the benefits of the adoptive home. (*Caden C., supra*, 11 Cal.5th at p. 633.) And we review the juvenile court's determination "under a hybrid standard, reviewing [the juvenile court's] factual determinations concerning the detriment analysis for substantial evidence but its ultimate weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion." (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068.)

Here, the only harm mother described at the hearing was daughter's sadness if she could not communicate with her family anymore, and mother essentially restates this claim on appeal. But there is no evidence that daughter experienced emotional instability or depression when a visit with mother ended or when daughter opted against visits with her for an extended period. Nor does mother address the evidence of daughter's indifference toward mother and mother's struggle with understanding daughter's mental health needs. Furthermore, against daughter's anticipated sadness weighed the offsetting benefits of the adoptive home where daughter had lived for over three years and developed a strong sense of belonging and security. (See *Caden C., supra*, 11 Cal.5th at p. 633 [stable home may alleviate emotional instability of loss of parent].) The balance the court reached was not an abuse of discretion, and it is not reasonably likely the court would have found that the scale tipped in favor of continuing mother's relationship with daughter and therefore declined to find daughter suitable for adoption had it not considered mother's parental role. Any error in the court's parental role comment was harmless.

## II

### *Appointment of Guardian Ad Litem*

Father contends the trial court committed prejudicial error when it appointed him a guardian ad litem.  The agency contends father consented to the appointment and, even if he did not, any error in the appointment was harmless.  We disagree that father consented but agree that the error was harmless.

A.     The Error

In a dependency case, a parent who is mentally incompetent must appear through a guardian ad litem.  (*In re James F.* (2008) 42 Cal.4th 901, 904 (*James F.*); Code Civ. Proc., § 372.)  The test for competence "is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case." (*James F.*, at p. 910.)  Such an appointment "radically changes the parent's role, transferring direction and control of the litigation from the parent to the [guardian ad litem]." (*In re Samuel A.* (2021) 69 Cal.App.5th 67, 70 (*Samuel A.*).)  "Consequently, the appointment must be approached with care and appreciation of its very significant legal effect." (*Id.* at p. 79.)

Before making the appointment, the juvenile court must hold an informal hearing at which the purpose and powers of a guardian ad litem and the reasons for believing the parent incompetent are explained to the parent.  (*James F., supra*, 42 Cal.4th at p. 904.)  If the parent consents to the appointment, the parent's due process rights are satisfied.  (*Id.* at p. 910.)  If the court appoints a guardian ad litem without the parent's consent, the record must contain substantial evidence of the parent's incompetence.  (*Id*. at p. 911.)

Here, although the agency appears to concede error in the appointment, it cursorily asserts that father's silence when the guardian ad litem was appointed should be construed as consent to the appointment.  We disagree.  There is no evidence the court explained the concept of a guardian ad litem to father, nor is there evidence that the court asked for father's consent.  (*In re Joann E.* (2002) 104 Cal.App.4th 347, 355-356.)

13

Because there was no consent, the record must contain substantial evidence of father's incompetence. Agency cites no such evidence, so we conclude the appointment was error and turn to whether that error was harmless. (*James F., supra*, 42 Cal.4th at pp. 918-919.)

B.    The Error was Harmless

In this harmless error review, we ask whether the appointment of the guardian ad litem affected the "outcome of a proceeding." (*James F., supra*, 42 Cal.4th at p. 918.) Father contends we should limit our review to the outcome of the proceeding that resulted in the guardian ad litem appointment. In his view, because there was no consent or finding of incompetence, the error was prejudicial. In support, he cites *Samuel A.* for the principle that "error in appointing a guardian ad litem for a parent without a supportable finding of incompetence is [prejudicial] under any standard." (*Samuel A., supra*, 69 Cal.App.5th at p. 82, fn. 10.) We disagree because *Samuel A.* is distinguishable.

In *Samuel A.*, the juvenile court had appointed a guardian ad litem during the reunification period, and the parent directly appealed from the appointment order. (*Samuel A., supra*, 69 Cal.App.5th at pp. 77-78.) Due to that procedural posture, the court was considering the prejudicial effect on the appointment order, not any subsequent orders. A better analogy to our facts is found in *In re Esmeralda S.* (2008) 165 Cal.App.4th 84. There the reviewing court considered an appeal from an order terminating parental rights, and the parent asserted a due process challenge to an order appointing a guardian ad litem earlier in the proceedings. (*Id*. at pp. 87, 92-93.) After agreeing with the due process violation, the reviewing court turned to the harmless error analysis. (*Id*. at p. 92.) The court acknowledged that the phrase "outcome of a proceeding" in *James F.* was unclear. (*Id.* at p. 93.) But, after considering the policy analysis in *James F.* stressing the importance of avoiding needless reversals of dependency judgments, the court concluded that the appointment error "may be deemed

14

harmless if the outcome of the review hearings [was] not affected by the violation." (*Ibid*.) We agree that this is the "more efficient and sensible test." (*Id*. at p. 94.)

Applying this test, father contends the error was nevertheless prejudicial because "it is not clear the outcome of the section 366.26 hearing would have been the same if the [guardian] had not been appointed." According to father, "there is a real possibility that the court may have ordered a permanent plan . . . if father had been allowed to testify or directly participate in the decisions regarding the trial strategy." Father's contentions are not persuasive.

"[A] finding that the juvenile court's error was prejudicial must be based on a claim of prejudice rather than *speculation of possible prejudice* – because it is simply inefficient to reverse a dependency judgment based upon speculation that an offending parent may have handled the case differently than his or her [guardian ad litem]." (*In re Esmeralda S., supra*, 165 Cal.App.4th at p. 96 (emphasis added).) Father's contentions are speculation of prejudice. The appointment occurred after reunification services had been terminated and shortly before the section 366.26 hearing. At this stage, the issues are limited to whether the child is adoptable and whether there is a statutory exception to adoption. (*In re Matthew Z.* (2000) 80 Cal.App.4th 545, 552-553.) Father does not contend that appointment of the guardian ad litem prevented him from providing additional evidence regarding those issues. Indeed, the guardian ad litem never spoke at the hearing and, unlike *Samuel A.* where the court prohibited the parent with a guardian ad litem from communicating directly with counsel (*Samuel A., supra*, 69 Cal.App.5th at pp. 77, 81), nothing in the record here suggests similar communication impediments were imposed on father. (See also *James F., supra*, 42 Cal.4th at p. 917 [nothing in the record suggested the parent was unable to express his wishes to the court].)

Also, father does not claim he could have offered additional facts via his testimony or other evidence. (See *In re Sara D.* (2001) 87 Cal.App.4th 661, 673 [parent's additional witnesses were not called after guardian ad litem was appointed for parent].)

In that regard, it is noteworthy that father does not challenge the court's finding regarding the parental relationship exception. Instead, he speculates that the "result of the termination hearing [had the guardian ad litem] not been appointed is [unknown]." Such speculation is insufficient particularly because the record shows daughter was open only to receiving letters from father as of August 2022 and had no in-person visits with father throughout this case outside of larger family gatherings and community visits. These facts predate the guardian ad litem's appointment in 2023. Father does not attempt to articulate how he could have shown that daughter had a substantial, positive, emotional attachment to him or that termination of his relationship with daughter would be detrimental to her. For these reasons, we conclude that the outcome of the termination proceeding would have been the same and the error in appointing a guardian ad litem for father was harmless.[5]

---

[5] We need not determine whether the harm should be analyzed under the standard for state law error stated in *People v. Watson* (1956) 46 Cal.2d 818, 836, the more exacting standard for federal constitutional error of *Chapman v. California* (1967) 386 U.S. 18, 24, or some intermediate standard of prejudice. (*James F., supra*, 42 Cal.4th at p. 911, fn. 1.) The error here was not prejudicial under even the more exacting standard.

## DISPOSITION

The orders terminating parental rights are affirmed.


/s/
MESIWALA, J.


We concur:


/s/
DUARTE, Acting P. J.


/s/
RENNER, J.


17